UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| ALACRITY SOLUTIONS GROUP, LLC, | Case No. 6:23-cv-01617-MTK |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| TRIAGE RESTORATION, | |
| Defendant. | |

**KASUBHAI,** United States District Judge:

Plaintiff Alacrity Solutions Group LLC ("Plaintiff") filed this action against Defendant Triage Restoration ("Defendant"). Plaintiff's claims arise out of Defendant's alleged breach of contract arising from a construction project covered by an insurance policy. Plaintiff moves for summary judgment, asserting there is no dispute that Defendant breached the contract, and that Plaintiff is entitled to indemnification.[1] Pl.'s Mot. Summ. J. ("Pl.'s Mot."), ECF No. 22. For the reasons below, Plaintiff's motion is GRANTED.

## BACKGROUND

This case is about a contract dispute. In short, Plaintiff refused to provide funding upfront for a construction project and Defendant eventually walked from the project. The Court finds

---

[1] The scope of Plaintiff's motion and the Court's Opinion relate to the issue of liability and not the amount of damages, which remains in dispute.

that the contract did not require Plaintiff to provide upfront funding and Defendant breached the contract when it abandoned the project.

I.      Overview

Plaintiff is a third-party administrator of a network of construction contractors. Plaintiff connects contractors with homeowners and insurers to provide repair and restoration work for insurance claims. Sangalli Decl. ¶ 3, ECF No. 23. Plaintiff acts as the conduit and facilitator between the insurance company, the insured policyholder, and the construction contractor. Sangalli Decl. ¶ 3. Patti White is the sole member and owner of Defendant, a small construction company operating as a general contractor. White Decl. ¶¶ 2– 3, ECF No. 27.

Defendant previously received construction projects from third-party administrator Nexxus Solutions Group, LLC ("Nexxus"). White Decl. ¶ 4. On April 15, 2020, Defendant received an email informing it that Plaintiff and Nexxus had merged. White Decl. ¶ 5. Plaintiff requested that Defendant review and sign a Network Membership Agreement ("NMA"), which would operate as the parties' contractual agreement going forward. The NMA specified, among other things, the notification process for work assignments from Plaintiff to Defendant, the approval process for Defendant's assignment proposals, and the payment process for interim and final payments. Sengalli Decl., ¶ 4; Sengalli Decl. Ex. 1 ("NMA"). The NMA also set forth Defendant's obligations, representations, and guaranties. On May 15, 2020, Defendant reviewed and signed the NMA. Sengallie Decl. ¶ 4. Whereas Nexxus had provided Defendant with project funding prior to completion of work, under the terms of the NMA, Plaintiff would only provide Defendant with reimbursement for work already completed.

## II.     Terms of the NMA

The NMA covered the working relationship between Defendant (the contractor), Plaintiff (the network administrator), and American National (the client). Contractor Compensation is detailed in § 18 of the NMA. Section 18(C) provides:

> Payments from Clients to Contractor will be issued to Contractor in accordance with the Client's business practices. All Payments, whether issued directly from the Client or whether issued pursuant to Network Administrator's Paying Agent Solution ("PAS"), will be made less fees owned [sic] by Contractor to Network Administrator. The PAS Addendum is attached hereto and incorporated by reference.

NMA § 18(C), at 9. Under the NMA, contractors are either compensated directly by the client, or the client sends the money to the network administrator, who then disburses the funds to the contractor, according to the terms of the PAS. Here, American Nation opted to send its payments to Plaintiff for disbursement to Defendant, triggering the terms of the PAS Addendum.

The PAS Addendum to the NMA stated that the "Network Administrator will disburse to Contractor funds received from Clients for work *performed* by Contractor." NMA at 25 (emphasis added). By signing the NMA, which incorporates the PAS Addendum, Defendant expressly agreed to Plaintiff's terms and conditions regarding interim payments. The PAS Addendum stated:

> Progress Payments. Interim funds ("progress payments") may be released through PAS upon request of the Contractor and pursuant to the Client's prearranged percentage allocated to materials and subcontractors. *Contractor understands and agrees that Network Administrator is not obligated to release interim funds.*

NMA at 26. Interim payments are therefore made at Plaintiff's discretion and according to its disbursement policies. Plaintiff's policy for disbursing interim funds to contractors was set forth in a document titled "Contractor Job Aid for PAS," which was provided to Defendant. Sengalli Decl. ¶ 5; Sengalli Decl. Ex. 2. Plaintiff's employees are obligated to review a contractor's request for an interim payment to ensure that the request is "reasonable to the

amount of work started & work completed." Sengalli Decl. Ex. 2 at 1. The policy also stated that the contractor should complete demolition and start structural repairs prior to the first PAS request, and that *paid* invoices are required for fund requests on material purchases. Sengalli Decl. Ex. 2 at 1.

In the event of a breach of contract for failure to perform an assignment, the NMA provided that the contractor would be liable to Plaintiff for the costs of completing the project, correcting defects, and for Plaintiff's reasonable costs and attorneys' fees. NMA § 11(C). The NMA also included an indemnification clause, requiring the contractor to pay Plaintiff for any expense arising out of the contractor's breach of the NMA or negligent work performance. NMA § 19.

### III. The Benefield Assignment

On December 8, 2020, a furnace explosion and fire damaged Kathleen Benefield's home. Lego Decl. ¶ 3, ECF No. 24. Ms. Benefield's home was insured by American National Insurance Company ("American National"), which worked with Plaintiff to facilitate the restoration of Ms. Benefield's home ("Benefield Assignment"). On January 8, 2021, Plaintiff assigned the Benefield Assignment to Defendant. The Benefield Assignment was Defendant's first assignment under the terms of the post-merger NMA. White Decl. ¶ 8. The parties do not dispute that the NMA was the operative contract between Plaintiff and Defendant for the Benefield Assignment. Under the terms of the NMA, Plaintiff was the network administrator, American National (on behalf of the policyholder, Ms. Benefield) was the client, and Defendant was the contractor.

Shortly after receiving the Benefield Assignment, Defendant requested about $5,000 to pay for an engineering report, explaining that the report was necessary to prepare an estimate for the Benefield Assignment and obtain permits from the township. Lego Decl. ¶ 4. Between April

and June of 2021, the parties had ongoing conversations in which Defendant stated that it could not carry the costs upfront; Plaintiff responded that it would only distribute funds for work that was completed, and Defendant replied that it could not start the work until it received funding. American National had deposited over $80,000 with Plaintiff and stated that it wanted the payments processed so that Defendant could begin the repairs. White Decl. Ex. 3 at 54–55. Plaintiff did not release the funds because, under the terms of the NMA, Defendant had not submitted the necessary documentation for the funds to be released. Lego Del. ¶ 5. However, in July 2021, Plaintiff disbursed approximately $5,000 to Defendant for the engineering report without Defendant having to pay for the report upfront. White Decl. ¶ 16.

On November 9, 2021, the day before Defendant was to start demolition work, Defendant requested disbursement of about $41,000. Hood Decl., Ex. 1 ("White Dep.") 57:13-25, 63:15-17, ECF No. 25; Hood Decl. Ex. 3, at 2. Plaintiff responded to Defendant's request, explaining that, under the terms of the NMA, at least twenty-five percent of the work needed to be performed before Defendant could request the first disbursement of funds. White Dep. 70:10-15; Hood Decl. Ex. 3, at 1.

On December 30, 2021, Defendant was notified that the disbursement of funds were "approved." White Decl. ¶ 19; White Decl. Ex. 3, at 25. The progress update on January 10, 2022, noted that the Benefield Assignment was at twenty-five percent. White Decl. Ex. 3, at 25. On January 25, 2022, Defendant informed American National that the payment had not been issued and that Defendant could not begin the work until after the funds were disbursed because Defendant was not in a financial position to carry the costs upfront. White Decl. Ex. 3 at 23. On January 26, 2022, Plaintiff again informed Defendant that additional funds would not be approved until the work for the amount requested was completed. White Dep. 74:16-25, 75:1-5,

Page 5 — OPINION AND ORDER

Hood Decl. Ex. 2, at 1. Defendant responded that it would submit the necessary documentation, but that it could not "float" the costs of the assignment. Hood Decl. Ex. 2, at 1-2. On January 28, 2022, Plaintiff disbursed $41,519.90 to Defendant for demolition work completed and other work that had not yet occurred. White Decl. Ex. 3, at 25; White Decl. ¶ 19.

On May 2, 2022, Defendant informed Plaintiff that it was not able to continue performing work on the Benefield Assignment unless it was paid in advance. Lego Decl. ¶ 8; Lego Decl. Ex. 2, at 2. Defendant explained that it needed an additional third of the final payment to continue. Lego Decl. ¶ 8; Lego Decl. Ex. 2, at 2. Plaintiff informed Defendant that it needed to submit receipts or documentation of payments made showing that the work completed had exceeded the payments already issued. Lego Decl. ¶ 8; Lego Decl. Ex. 2, at 1. Defendant responded to Plaintiff, "[w]hile I completely understand you have rules, as I recall from our previous conversation that you don't pay up front[,] simply we cannot carry costs. If you want to reassign to someone that can carry the costs—I will release Kathleen Benefield from the contract. Let me know how you want to proceed." Lego Decl., Ex. 3 at 1. Plaintiff then assigned the Benefield Assignment to another contractor, A. Molly Restoration & Remediation, LLC ("A. Molly"), who completed the Benefield Assignment. Lego Decl. ¶ 10.

Plaintiff asserts that Defendant's refusal to complete the work without interim payments of upfront costs caused a fourteen-month delay in the completion of the Benefield Assignment and forced Plaintiff to incur additional costs. Lego Decl. ¶ 14. For example, Plaintiff had to pay the additional living expenses to Ms. Benefield that exceeded the coverage of her insurance policy. Ms. Benefield's home was a duplex, and Plaintiff contends that Defendant also breached the contract by failing to protect the adjoining property from damage.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

## DISCUSSION

Plaintiff moves for summary judgment, arguing that there is no dispute that Defendant is liable for its breach of the NMA and must indemnify Plaintiff for the additional costs that resulted.

I.   **Breach of Contract Claim**

To prevail on a breach of contract claim, the plaintiff must prove that the parties had a contractual agreement, that the plaintiff fully performed without breach, and that the defendant's

breach caused damage to the plaintiff. *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996). "A breach is material if it goes to the very substance of the contract and defeats the object of the parties in entering into the contract." *Matter of Bisio's Est.*, 33 Or. App. 325, 331 (1978).

Here, the parties agree that the NMA was the operative contract regarding the Benefield Assignment. Plaintiff argues there is no dispute that Defendant breached the NMA on three occasions: (1) Defendant failed to timely start work on the Benefield Assignment and then ultimately refused to complete work on the Benefield Assignment; (2) Defendant failed to protect the adjoining property from damage or loss; and (3) Defendant refused to correct the damage it caused or reimburse Plaintiff for the costs incurred due to Defendant's default. Defendant disputes these breaches and argues that summary judgment is improper because the NMA was ambiguous on the timing of interim payments.

### A.     First Breach: Failing to Timely Start and Refusing to Complete the Work

Plaintiff argues there is no dispute that the NMA did not require Plaintiff to provide upfront or interim payments for work not yet completed, and that Defendant breached when it refused to start and then failed to finish the Benefield Assignment without upfront disbursement of funds. Based on the record before the Court, there is no dispute that Defendant failed to timely start and did not complete the Benefield Assignment. Defendant argues that Plaintiff is not entitled to summary judgment because, (1) the NMA is ambiguous regarding the timing of payment; (2) Plaintiff waived or should be estopped from claiming Defendant breached the contract; and (3) that the NMA is ambiguous regarding a contractor's access of payments. The Court disagrees and finds that there is no dispute that Defendant breached the NMA by failing to timely start and by refusing to complete the Benefield Assignment.

1. <u>Timing of Payment</u>

Under the NMA, the specifications and requirements of each assignment are governed by the terms of a Contractor's Proposal and Work Order. Defendant argues that the NMA is ambiguous as to the timing of payment because the Contractor's Proposal and Work Order may modify the timing of payments. For example, the Contractor's Proposal section of the NMA states "[i]f Contractor intends to request payment arrangements other than one final payment, its Proposal shall include a proposed schedule of payment for work." NMA Ex. B § 2(G), at 15. Defendant argues that because Plaintiff did not require it to submit a Contractor's Proposal, and because Plaintiff never issued a specific Work Order, the payment terms of the Benefield Assignment are ambiguous. Plaintiff replies that the absence of a Contractor's Proposal and Work Order demonstrates that there was no agreement to modify the payment terms from those set forth in the PAS Addendum, which is not ambiguous.

A party is entitled to summary judgment based on the meaning of a contract only if the terms of the contract are unambiguous. *Wells Fargo Bank, NA v. Haas*, 279 Or. App. 393, 398 (2016). "A contract provision is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation; it is unambiguous if its meaning is so clear as to preclude doubt by a reasonable person." *Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or. App. 305, 317 (1985). If the provision is clear, the court construes the term as a matter of law, and the analysis ends. *Yogman v. Parrott*, 325 Or. 358, 361 (1997).

The Court finds that the NMA is unambiguous regarding the timing of payments. The Contractor Proposal section of the NMA establishes that, absent a request for different payment terms, the NMA will provide one final payment for work completed and that the terms of the Contract Documents, such as the PAS Addendum, "shall apply to any Work Orders issued under this Section." NMA Ex. B § 3 at 16. The PAS Addendum provides that progress payments "may

be released through PAS upon request" but that the "Contractor understands and agrees that Network Administrator is not obligated to release interim funds." NMA at 26. The PAS Addendum further provides that the "Network Administrator will disburse to Contractor funds received from Clients for work *performed* by Contractor." NMA at 25. The timing of payments under the NMA is unambiguous. Unless agreed to otherwise, progress payments are issued at Plaintiff's discretion and for work that the Contractor has already performed.

    2. Waiver

Defendant argues that because Plaintiff disbursed *some* funding to Defendant for work not yet performed, Plaintiff waived its right to assert that Defendant's refusal to perform without upfront funding constituted a breach.

Under Oregon law, "waiver is the voluntary relinquishment of a known right." *Alderman v. Davidson*, 326 Or. 508, 513 (1998). To waive a contractual right, a party must act with the "knowledge and intention" to surrender that right. *Id.* (quoting *Mitchell v. Hughes*, 80 Or. 574, 580–81 (1916)). A clear, unequivocal, and decisive act is required to show waiver by conduct. *Bennett v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 157 (2001). A waiver occurs if the party acts "so as to justifiably induce the other party" into believing that it will not enforce that provision of the contract. *Cusick v. Meyer*, 124 Or. App. 515, 522 (1993).

Here, Defendant argues that "it would be inequitable for Alacrity to have knowledge of Triage's exact position on payment for 18 months, do nothing, and then seek damages related to Triage for doing exactly what it said it was going to do." Def's. Resp. at 22, ECF No. 26. The Court disagrees. Defendant agreed to the Benefield Assignment under the terms of the NMA and PAS Addendum which expressly stated that funding is disbursed for work performed. Defendant's argument that Plaintiff waited eighteen months and did nothing is unsupported by the record before the Court. The two occurrences when Plaintiff provided interim funds do not

demonstrate a clear, unequivocal, and decisive act of waiver. The first occurrence was in July 2021, when Plaintiff released $4,801.56 to Defendant for an engineering report, and the second occurrence was in January 2022, when Plaintiff released $41,519.90 to Defendant for demolition work and other work that had not yet occurred. White Decl. ¶¶ 15, 19. Plaintiff repeatedly conveyed to Defendant that it would not release payments for work that had not been completed, and Defendant stated that it "completely understand[s] you have rules, as I recall from our previous conversation that you don't pay up front[.]". Lego Decl., Ex. 3 at 1.

     Furthermore, Plaintiff's authorization of interim payments was consistent with the terms of the NMA and PAS Addendum. The payment of $41, 519.90 was the first interim request pursuant to the PAS, which provided that "25% funds are available for the FIRST request (up to $50,000)." Lego Decl. Ex. 1, at 3. When Defendant asked for an additional third of the total payment, Plaintiff informed Defendant it would "need to upload receipts or documentation of payment to subs as the work completed to date does not exceed what we already issued." Lego Decl. Ex. 2, at 2. Specifically, the PAS Addendum of the NMA provided that progress payments "may be released through PAS upon request of the Contractor and pursuant to the Client's prearranged percentage allocated to materials and subcontractors" and that "Contractor understands and agrees that Network Administrator is not obligated to release interim funds." NMA 26. The "Contractor Job Aid for PAS" further provided that all requests for progress payments "should be reasonable to the amount of work started [and] work completed." Sangalli Decl. Ex. 2, at 1. Plaintiff maintained the standards set forth in the PAS Addendum when it issued interim payments. It did not waive the right to seek damages for Defendant's failure to perform.

3. Contractor's Access of Funds

Defendant argues that the NMA is ambiguous regarding a contractor's access to funds and that Plaintiff willfully withheld payments from American National without just or sufficient cause, preventing Defendant from performing.

As described in the background section above, under § 18(C) of the NMA, contractors are either compensated directly by the client, or the client sends the money to the network administrator, who then disburses the funds to the contractor, according to the terms of the PAS. NMA at 9. Here, American Nation opted to send its payments to Plaintiff for disbursement to Defendant, triggering the terms of the PAS Addendum. The PAS Addendum to the NMA stated that the "Network Administrator will disburse to Contractor funds received from Clients for work *performed* by Contractor." NMA at 25 (emphasis added). American National could have paid Defendant directly. However, it selected a compensation method under the NMA in which it chose Plaintiff to act "as a facilitator to disburse payments received from Clients upon Contractor's completion of repair work and compliance with the terms and conditions of the [NMA] and all other Contract Documents." NMA 25. The NMA is not ambiguous regarding a contractor's access to funds, and Plaintiff's disbursement of funding was consistent with the express terms of the NMA and PAS Addendum.

B. **Second Breach: Failing to Protect the Adjoining Property From Damage or Loss**

Plaintiff next argues that Defendant breached the NMA when it allegedly failed to protect the property adjacent to the Benefield Assignment. Specifically, Plaintiff asserts that Defendant negligently caused damage to the adjoining property's kitchen during the demolition stage of the Benefield Assignment and that Defendant was contractually bound to repair the damage, which costs Plaintiff $4,873.06. Defendant responds that the cause of the damage remains in dispute.

Under the NMA, the contractor is obligated to "protect the Policyholder's property and adjoining properties from injury or loss arising in connection with each" assignment. NMA § 15(A) at 8. The contractor is not responsible for property damage caused by the network administrator or policyholder. *Id.*

Ms. Benefield lived in a duplex. Plaintiff's Regional Flied Manager, Mr. Lego, attests that Ms. Benefield's neighbor told him that the adjoining property "sustained water damage to the kitchen wall and ceiling from water entering through the common wall that was demolished by Triage." Lego Decl. ¶ 11. Plaintiff submits photographs of the duplex before and after Defendant started its demolition work, purportedly showing that Defendant left an opening in the rear of the neighbor's home. Lego Decl. ¶¶ 12, 13. The photographs do not show water entering the opening. Mr. Lego, opines that "[t]he exposed wall on the exterior allowed water to enter, which caused water and mold damage to the drywall and insulation in the kitchen." Lego Decl. ¶ 13. Other than speaking with the neighbor and looking at photographs, Mr. Lego does not explain the basis for his knowledge. For example, there is no evidence that Mr. Lego visited the neighbor's property or retained an expert to determine the cause of the water damage and mold. Mr. Lego's conclusions, based on photographs and the neighbor's observations, are insufficient to establish causation as a matter of law. Defendant's principal, Ms. White, stated that she was completely unaware of any issues with respect to the water damage and that Triage's work was consistent with industry standards. The cause of the water damage remains unclear on this record.

**C.    Third Breach: Defendant's Refusal to Correct the Damage Caused or to Reimburse Plaintiff**

Lastly, Plaintiff argues that Defendant's failure to reimburse Plaintiff for the costs of curing Defendant's breaches constitutes an independent breach of the NMA. Defendant does not

directly address Plaintiff's argument. Instead, Defendant denies that it breached and asserts, in the alternative, that summary judgment is improper because the NMA is ambiguous. For the reasons explained above, the Court finds that the NMA is unambiguous and Defendant's failure to timely start and complete the Benefield Assignment constitutes a breach.

The Default and Termination section of the NMA provides that a breach of the NMA constitutes an entry of default and that in the event of a default, the contractor is obligated to reimburse Plaintiff for all costs caused by the contractor's default. NMA at 6. Plaintiff engaged another contractor to complete the Benefield assignment and notified Defendant of the costs Plaintiff incurred to correct the event of default. Sangalli Decl. ¶ 9; Sangalli Decl. Ex. 3. Plaintiff notified Defendant in writing on August 29, 2023, and Defendant refused to reimburse Plaintiff. Sangalli Decl. ¶ 9; Sangalli Decl. Ex. 3. The Court finds that Defendant's refusal to reimburse Plaintiff for costs incurred because of Defendant's default constitutes a breach of the NMA.

## II.    Indemnity Claim

Plaintiff next moves for summary judgment on its indemnity claim. Plaintiff argues that pursuant to the NMA's indemnity clause, Defendant agreed to indemnify Plaintiff for all costs incurred as a result of Defendant's failure to perform. Defendant responds that the indemnity clause of the NMA only applies to third-party claims against Plaintiff, not a first-party claim between the contractor and network administrator.

The Court finds that the indemnity clause of the NMA does not apply to direct claims between Plaintiff and Defendant.

Section 19 of the NMA provides:

> Indemnity. Contractor agrees to indemnify, hold, harmless and defend (with counsel of network administrative choice) Network Administrator . . . against any claim, judgment, loss, settlement, cost, damage or other expense, including, but not limited to attorney fees, arising out of error or omission, fraudulent, negligent, or

> other unauthorized acts, by Contractor, or subcontractors, or the performance, non-performance, or breach of this Agreement, or any Work Order by Contractor, or at subcontractors, whether or not due to or caused in part by the negligence or other culpability of [Network Administrator]. Network Administrator shall have exclusive authority to direct the defense and affect any settlement in any action for which the foregoing indemnity may apply.
>
> Contractor also agrees to reimburse Network Administrator for any judgment, loss, settlement, costs, damage or other expense (including but not limited to attorney's fees) incurred by Network Administrator in answering, defending or otherwise addressing an arbitration claim, attachment, complaint, court proceeding, dispute, garnishment, regulatory or other inquiry or investigation, or other proceeding involving Contractor. . . .

NMA § 19 at 9.

If the indemnity clause applied to claims between Plaintiff and Defendant, then Plaintiff would have exclusive authority to settle a counterclaim in this lawsuit brought by Defendant, an interpretation that "leads to absurd results, making it unreasonable." *PacifiCorp v. SimplexGrinnell, LP*, 256 Or. App. 665, 672 (2013).

Plaintiff replies that it has presented undisputed evidence of two third-party claims asserted against it involving Defendant. First, Plaintiff argues that Defendant must indemnify it for the costs of settling the claim brought by Ms. Benefield's neighbor for the cost of repairing the adjoining wall. For the reasons described above, the cause of the water damage remains in dispute and this Court cannot rule as a matter of law that Defendant must indemnify Plaintiff for settlement of a claim which a jury could conclude did not in fact involve Defendant. If, for example, a jury found that the water damage was caused by a faulty pipe, then the indemnification clause would not apply because the claim would be one "involving Contractor." NMA § 19 at 9.

Second, Plaintiff argues that Defendant must indemnify it for the costs of settling the claim brought by American National, who sought payment for the costs of alternative living

Page 15 — OPINION AND ORDER

expenses beyond the limits of the insurance policy paid for Ms. Benefield's extended relocation. Coit Decl., Ex. 2 (Demand from American National to Alacrity for $42,552.85 for reimbursement of ALE paid on behalf of Ms. Benefield over the limit of her policy), ECF No. 31. There is no dispute that Defendant's breach of the NMA caused a delay in the completion of the project. The third-party claim brought by American National necessarily involves Defendant and is subject to the indemnification clause.

Plaintiff does not submit any evidence supporting the allegation that the additional living expenses were incurred solely because of Defendant's delay and refusal to complete the Benefield Assignment. The email Plaintiff relies on simply states that expenses were incurred and blanketly asserts they were incurred for "delays caused by [Defendant's] company." The email does not provide sufficient evidence to support summary judgment on this third-party claim. Like the first third-party claim brought by the owner of the neighboring property, here, Plaintiff again fails to submit evidence showing that Defendant was the sole cause of the additional living expenses incurred by Ms. Benefield's extended relocation.

### IV. Attorney Fees

The NMA unambiguously provides for prevailing party attorney fees. Under Or. Rev. Stat. § ("ORS") 20.096(1):

> In any action or suit in which a claim is made based on a contract that specifically provides that attorney fees and costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the party that prevails on the claim shall be entitled to reasonable attorney fees in addition to costs and disbursements, without regard to whether the prevailing party is the party specified in the contract and without regard to whether the prevailing party is a party to the contract.

The prevailing party on a claim is the party who receives a favorable judgment on the claim. *16TH Grp., LLC v. Lynch Mech. Const., LLC*, 265 Or. App. 217, 221 (2014); ORS 20.077(2). Whether a party has obtained a favorable judgment is determined on a claim-by-claim

basis, "by weigh[ing] 'what was sought by each party against the result obtained.'" *Id.* (quoting *Beggs v. Hart*, 221 Or. App. 528, 538 (2008)).

Here, Plaintiff sought and was granted in part summary judgment on both of its claims against Defendant. Although the amount of damages remains in dispute, Plaintiff has secured a "material alteration of the legal relationship of the parties" and is entitled to an award of the attorney fees incurred as a result of Defendant's conduct. *Texas State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93 (1989).

## CONCLUSION

For the reasons above, Plaintiff's Motion for Summary Judgment (ECF No. 22) is GRANTED in part and DENIED in part.

DATED this 24th day of July 2025.

                                        s/ Mustafa T. Kasubhai
                                        MUSTAFA T. KASUBHAI (He / Him)
                                        United States District Judge